IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RAYMOND ALEXANDER,        )
                                    )    Civil Action No. 07 - 1732
            Plaintiff,       )
                                    )    Magistrate Judge Lisa Pupo Lenihan
v.                             )    Doc. No. 53
                                    )
C.O. FRITCH, et al,         )
                                    )
          Defendants.      )

## MEMORANDUM OPINION

        Plaintiff, Raymond Alexander, is a Pennsylvania inmate currently is housed at the State Correctional Institution at Mercer, Pennsylvania.  He commenced this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 against sixteen Defendants employed by the Pennsylvania Department of Corrections (DOC) alleging that they knowingly, maliciously and intentionally failed/refused to provide Plaintiff with the same rights, services, and considerations routinely granted to other inmates and did so in retaliation for Plaintiff's prior exercise of constitutionally protected conduct of filing grievances and lawsuits.  Defendants include the following:  Jeffrey Beard, Secretary of the DOC; Sharon Burks, former Chief Grievance Coordinator at the Secretary's Office of Inmate Grievances and Appeals; Cindy Watson, formerly employed in the Secretary's Office of Inmate Grievances and Appeals; Timothy Pleacher, former Staff Assistant at the DOC's Central Office; Paul Stowitzky, former Superintendent at SCI-Mercer; Richard Culp, Captain at SCI-Mercer; Edward Pavlick, former Unit Manager at SCI-Mercer; Fred Ruffo, Deputy Superintendent for Centralized Services at SCI-Mercer; Michael Mahlmeister, Deputy Superintendent for Facilities Management at SCI-Mercer; Michael Harlow, Superintendent at SCI-Mercer; Barbara Palladino, former Psychological Services Specialist at SCI-Mercer; William

Woods, Unit Manager at SCI-Mercer; Burt Brocklehurst, Unit Manager at SCI-Mercer; Christopher Fritch, former Corrections Officer at SCI-Mercer; James Viscusi, former Corrections Officer at SCI-Mercer; and Elmer Kite, Corrections Officer at SCI-Mercer.  Presently pending is Defendants' Motion for Summary Judgment (doc. no. 53).  For the reasons that follow, Defendants' Motion will be granted.

### A. Standard of Review - Summary Judgment

Defendants have filed a motion for summary judgment pursuant to Fed. Rule Civ. Proc. 56.  Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case.").  The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth specific facts showing that there is a genuine issue for trial or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Fed. Rule Civ. Proc. 56(c).  *See also* Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An disputed issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A disputed fact is

material when it could affect the outcome of the suit under the governing substantive law. <u>Anderson</u>, 477 U.S. at 248.  The inquiry, then, involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting <u>Anderson</u>, 477 U.S. at 251-52).  If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50.

## B. Plaintiff's Allegations and Material Facts

Neither Defendants nor Plaintiff has proffered a clear statement of the relevant facts. Thus, the Court was required to sift through the entire record which, taken in the light most favorable to Plaintiff as the non-moving party, reveals the following.  Plaintiff Alexander, presently an inmate at the State Correctional Institution at Mercer, formerly was incarcerated at the State Correctional Institutions at Albion and Frackville.  While incarcerated at these institutions Plaintiff filed many grievances and complaints. In February of 2004, he filed a *pro se* civil rights action in the United States District Court for the Middle District of Pennsylvania against thirty named DOC officials and six John Doe defendants claiming violations of his civil rights under the First and Fourteenth Amendments.  As noted by the Honorable Thomas I. Vanaskie:

>  .   .   .   Alexander has haled into federal court every corrections official who either (a) had some involvement in handling Alexander's numerous formal grievances that were not resolved to Alexander's satisfaction (and even one that ultimately was decided in his favor); (b) had some involvement in his transfer from the State Correctional Institution at Albion to the State Correctional Institution at Frackville, a transfer that brought him 250 miles closer to his home; (c) was involved in the processing of a misconduct report he received while incarcerated at SCI-Frackville; or (d) otherwise took action that Alexander did not think was authorized, such as refusing to allow

3

him to take a chess board into a meeting.  The thrust of Alexander's claims is that each Defendant's purportedly adverse action was taken to retaliate against Alexander for his propensity to file administrative grievances.

Alexander v. Forr, Civil No. 04-0370, 2006 WL 2796412 (M. D. Pa. Sept. 27, 2006).  In that case, District Judge Vanaskie adopted the Report and Recommendation of Magistrate Judge Malachy E. Mannion who recommended that summary judgment be entered in favor of all defendants because Alexander had not presented any evidence of a causal link between his pursuit of his administrative grievances and the alleged adverse actions attributed to each defendant.  Alexander appealed this determination, which was affirmed by the Court of Appeals for the Third Circuit in Alexander v. Forr, 297 Fed. App'x 102 (2008).

In the meantime, Plaintiff was transferred to SCI-Mercer on or about June 14, 2005 and placed in housing unit G A 6-1(doc. no. 62-2, p. 186).  After arriving at SCI-Mercer, Plaintiff spoke with his counselor, Mr. Cole, regarding a housing change and was told that inmates were not moved to another housing unit outside the original counselor's area.  On July 24, 2005, Plaintiff began his letter writing campaign by writing an inmate request to Deputy Superintendent Neiswonger wherein he stated as follows.

> I discussed with Mr. Cole the requirements of DOC Policy Statement 1.1.7, "Smoking in the DOC," which clearly and explicitly states that inmates have the right to be housed in a nonsmoking housing unit and to be celled/roomed with nonsmokers.  Staff are required to accommodate inmates' wishes by providing such housing assignments.  Mr. Cole refuses to do so.

> Please examine the policy statement to determine its requirements and instructions.  Please instruct Mr. Cole to provide for me a nonsmoking housing unit assignment with a nonsmoker cell mate.  Thank you.

4

Doc. No. 62-1, p. 26.[1]  In response, Plaintiff was informed: "You are housed on G Unit which has a smoking room, if you do not enter that room you will not be subject to smoke."

Four days later, Plaintiff wrote a similar inmate request to Superintendent Stowitzky wherein he reiterated his request to be housed in a nonsmoking housing unit with a nonsmoker (doc. no. 62-1, p. 27).  Following another request dated August 8, 2005, Plaintiff was informed as follows.

> G Block smoking is restricted to an established smoking room which has an outside exhaust.  As such you are housed in a non-smoking area.  When Bldg 13 is opened I will ensure you are moved there as the unit will have no smoking inside, only outside.

Doc. No. 62-1, p. 28.

Plaintiff claims that he and three other inmates submitted paperwork to Defendant Fritch asking to be housed in the same cube.  Allegedly, Fritch told inmate Tice (EJ-7868) that he would be moved but that "Alexander won't be around here very long because of the way he files grievances."  Doc. No. 62-2, p. 40.  On November 6, 2005, Plaintiff requested from Defendant Brocklehurst a copy of DOC's sexual harassment policy, which was provided to him on November 7, 2005.  On December 2, 2005, Plaintiff claims that he reported a sexually harassing hostile environment to Unit Manager Brocklehurst who told him that the offending individuals would be moved (doc. no. 62-2, p. 40).  On December 6, 2005, Plaintiff wrote to Defendant Brocklehurst seeking information regarding cell agreements and asking "What are you going to do to address the problem we discussed?"  Doc. No. 62-1, p. 30.  Plaintiff was advised as follows.

> I was unable to find any policies regarding cell agreements. Feel free to explore other avenues to get the answers you are looking for.

---

1.  Plaintiff attached a copy of some of the pages of the now outdated DOC Smoking Policy 1.1.7, doc. no. 62-1, pp. 1-4.

> We discussed several problems. I'm not sure which issue you
> are talking about. Stop by my office during working hours and I will
> address your concerns.

Doc. No. 62-1, p. 30. On December 18, 2005, Plaintiff wrote a request to Deputy Superintendent

Neiswonger asking about DOC policy regarding cell agreements. Neiswonger responded as follows.

> To my knowledge: the only thing covered in DOC policy with cell
> agreements deals with smokers and nonsmokers. All other aspects of
> cell agreements were through local policy and this institution has
> none.

Doc. No. 62-1, p. 31.

On January 4, 2006, Plaintiff wrote Grievance No. 140093 complaining about: 1)

his efforts regarding his housing requests pursuant to the DOC smoking policy and the "threat" to

move him to D block; 2) his unsuccessful efforts to be housed with three other inmates in the same

cube and the alleged remark by Defendant Fritch to inmate Tice that "Alexander won't be around

here very long because of the way he files grievances"; and 3) Brocklehurst's alleged inaction

regarding his report of a sexually harassing hostile environment (doc. no. 62-1, pp. 18-19). On

January 5, 2006, Plaintiff was moved to D Unit, which was a nonsmoking housing unit. On that

date, he wrote a letter to Defendant Beard complaining that he was transferred to SCI-Mercer in

retaliation, that all actions taken against him were in retaliation and that Beard's failure to

investigate and ameliorate the situation would result in a federal civil rights lawsuit (doc. no. 62-2,

p. 40). On January 11,2006, Defendant Sharon Burks responded to this letter by informing Plaintiff

that he would receive a response to his concerns through the grievance process (doc. no. 62-2, p. 42).

Defendant Edward Pavlick responded to Grievance No. 140093 by informing Plaintiff that, as

previously advised by Superintendent Stowitzky, D Block was a nonsmoking housing unit and

Plaintiff was scheduled to be moved there when it was operational. When it became operational,

Plaintiff was moved pursuant to his own request to be housed in a nonsmoking housing unit (doc. no. 62-1, p. 20).  Plaintiff appealed this grievance to Superintendent Stowitzky claiming that his move violated Mercer's policy prohibiting housing changes that require changing the initial counselor assigned.  In response, Stowitzky informed Plaintiff that the facility maintains the authority to house inmates based on the availability of bed space and security needs (doc. no. 62-1, p. 23).  Plaintiff appealed this decision and threatened to file a civil lawsuit against all involved staff (doc. no. 62-1, p. 24).  On March 2, 2006, Defendant Burks responded to his appeal informing him that he was moved to D Block pursuant to his request to be housed in a nonsmoking facility and that the facility was unable to accommodate requests for cell changes in order for him to be celled with his friends (doc. no. 62-1, p. 25).

On January 21, 2006, Plaintiff wrote an inmate request to his Unit Manager, Pavlick, asking where he was on the waiting list to be moved to I Block and K Block.  In response, Pavlick informed him there were several names ahead of him for both units but that K Unit had a smoking room (doc. no. 62-1, p. 32).  On February 27, 2006, Plaintiff again wrote to Defendant Pavlick demanding to know what he was going to do to prevent the excessive noise and smoking in the dorms.  Plaintiff wrote a similar request on March 13, 2006 (doc. no. 62-1, p. 34).  Defendant Pavlick responded as follows.

> 1.  As directed by Supt. Stowitzky, you were moved from G to D because of your complaints about smoking in G.  I have not moved you to K because of the similar situation in K (a smoking room).  If I move you to K, how long before the complaints start about smoking in that Unit?
>
> 2.  I have spoken to the officers on all three shifts about alleged smoking and noise.  We know inmates are sneaking smokes but have been unable to catch anyone red handed.  As for noise, the officers

> report that the unit is not excessively noisy.  With 80 people in a
> small area, it is impossible to have complete quiet.

Doc. No. 62-1, p. 34.

On March 3, 2006, Plaintiff wrote to Secretary Beard complaining about his move to D Block and the cable services therein (doc. no. 62-2, p. 43).  On March 7, 2006, Plaintiff filed Grievance No. 145919 against Sharon Burks claiming that she retaliated against him when she denied his Grievance No. 140093 (doc. no. 62-1, p. 35).  This Grievance was rejected on May 1, 2006 (doc. no. 62-1, p. 36).

On March 23, 2006, Plaintiff was moved to cell D 3.  He claims that D Block was substandard housing that was used to punish inmates released from disciplinary custody and subsequently was ordered evacuated and closed pending improvements (doc. no. 62-2, p. 186).  On April 3, 2006 Plaintiff was moved to J A 8-1 due to the closing of D Block.  At that time, Defendant Pavlick was the Unit Manager of J Unit.  On January 3, 2007, inmate Kennedy replaced inmate Miller as Plaintiff's cellmate after Miller was allowed to move to a specific cell (J B 13-2) with a specific cell mate (Kane) of his choosing.  On January 10, 2007, Plaintiff was moved to J A 4-1 to accommodate Kennedy's request for a specific cell mate.  On January 23, 2007, Plaintiff was moved to J A 11-1 to accommodate two inmates' requests to be cell mates.  At that time, he and Philbert Wilson (ET-2863) became cell mates.

On May 1, 2007, Plaintiff wrote an inmate request to Superintendent Stowitzky requesting a records box and stating that a similar request had been granted for his cell mate Wilson. This request was denied on May 10, 2007 (doc. no. 62-2, p. 1).  Included in the record is a similar request by inmate Wilson, that was granted by Stowitzky on April 30, 2007 (doc. no. 62-1, p. 82).

In July of 2007, Defendant Woods replaced Defendant Pavlick as the Unit Manager of J Unit.  As Unit Manager, Woods is responsible for four units, including J Unit. J Unit is the only unit of which he is in charge that has a typical cell-oriented layout. Two of the other three units of which he is in charge have a dormitory-style layout.  Woods does not utilize "cell agreements" in any of his units.  Instead, he rewards individuals from the dormitory-style units with a transfer to J Unit if their conduct warrants such a reward.  Due to the number of inmates housed at SCI-Mercer, there is currently a former dayroom on J Unit that is being used as dormitory space.  That large dayroom, which is on the second tier of J Unit, currently houses seven inmates.  In order to maintain fairness in the housing unit, Woods has implemented a "first-in, first-out" practice with regards to this dayroom. Accordingly, when there is an open bed in the unit, the seven inmates in the dayroom are offered that bed, in the order of their arrival on the unit.  Only if none of those seven inmates want the bed would it be offered to any other inmates (doc. no. 55-2, pp. 10-15).

On August 22, 2007, Wilson was removed from Plaintiff's cell due to a disciplinary violation and inmate Lessa was assigned to Plaintiff's cell until November 22, 2007.  At that time, Wilson was fifth in seniority of the seven dayroom inmates.  The four more senior inmates declined to move to J A 11-2 to be Plaintiff's cell mate.  Although Wilson and Plaintiff made specific requests to be cell mates, and allegedly contrary to Woods' policy described above, Wilson was not offered to cell with Plaintiff in J A 11-2 after the more senior inmates declined (doc. no. 62-1, p. 12).

On September 3, 2007, Plaintiff sent an inmate request to Defendant Woods asking that his former cell mate, inmate Wilson, be allowed to move back in with him as his current cell mate was scheduled to leave (doc. no. 62-1, p. 73).  On September 4, 2007, Plaintiff wrote another

inmate request to Defendant Woods demanding that he be celled with inmate Wilson, a nonsmoker, in accordance with DOC policy.  This request was denied and Plaintiff was informed that he was housed in accordance with DOC policy as J Block was a nonsmoking block (doc. no. 62-1, p. 74).

On September 24, 2007, Plaintiff wrote Grievance No. 201818 claiming that DOC had taken excessive funds out of his account to pay for his court costs and fines (doc. no. 62-2, p. 21).  On October 4, 2007, Plaintiff received a response that indicated that the overdraw was a mistake and that it would be corrected (doc. no. 62-2, p. 22).[2]  Plaintiff appealed this response claiming that the issue was not resolved in a timely manner due to staff's retaliation (doc. no. 62-2, pp. 23-25).  On November 13, 2007, Defendant Cindy Watson provided a final response indicating that Plaintiff had failed to provide sufficient evidence of staff retaliation (doc. no. 62-2, p. 26).

On November 5, 2007, Plaintiff wrote a letter to Defendant Woods informing him that his refusal to allow Wilson back into his cell violated Plaintiff's rights under DOC policy and that his refusal to provide Plaintiff with the same rights provided to other inmates would result in Plaintiff seeking relief in another forum (doc, no. 62-1, p. 75).  Defendant Beard was copied on this letter.  On November 13, 2007, Defendant Tim Pleacher, Staff Assistant for the Western Region wrote to Plaintiff informing him that it was not necessary to copy Secretary Beard as the matter would be resolved at the institutional level and through the grievance process if necessary (doc. no. 62-2, p. 83).  On November 29, 2007, Plaintiff wrote inmate Grievance 209002 requesting that Mr. Pleacher be instructed that he is to properly investigate all written claims of retaliation against inmates (doc. no. 62-2, p. 31).  On November 25, 2007, Plaintiff wrote a request to the facility grievance coordinator complaining that Beard failed to investigate his claims of retaliation and that

---

2.  Plaintiff's account was credited on October 10, 2007 (doc. no. 62-2, p. 26).

all staff should be severely reprimanded and required to take training courses designed to instruct staff on the proper response to an inmate's exercise of his protected conduct (doc. no. 62-2, p. 27). On November 26, 2007, Plaintiff wrote another request to the facility grievance coordinator complaining about Watson's response to Grievance No. 201818 (doc. no. 62-02, p. 28).

On November 21,2007, Plaintiff wrote another request to Woods stating that DOC policy, 11.2.1, requires that double celling of an inmate be based on an inmate's expression of preferences and that such requests should be accommodated if possible.  Plaintiff further threatened that Woods' denial to allow him to cell with Wilson would result in a federal court action (doc. no. 62-1, p. 76).  In response, Woods reiterated his policy concerning J Block status.  In addition, a response to this request was provided to Plaintiff by Defendant Steven Glunt, Staff Assistant Western Region, on December 13, 2007 (doc. no. 62-2, p. 35).

On November 26, 2007, Plaintiff wrote another letter to Secretary Beard complaining about Mercer staff and stating that it was Beard's duty to rid all DOC facilities of any and all staff who retaliate against protected conduct (doc. no. 62-1, p. 77).  On December 11, 2007, Defendant Pleacher responded to this letter (doc. no. 62-2, p. 34).  Plaintiff wrote back to Defendant Pleacher on December 25, 2007 (doc. no. 62-2, p. 36).  Defendant Pleacher acknowledged this letter on January 15, 2008 and advised Plaintiff that SCI-Mercer was not violating housing policy and that he did not intend to continue to debate this issue (doc. no. 62-2, p. 37).  Plaintiff again wrote to Pleacher on January 17, 2008 asking what he intended to do about the retaliation (doc. no. 62-2, p. 38).  Plaintiff received another letter from Pleacher dated January 29, 2008 again advising him that staff at Mercer were not violating housing assignment policy and that no action on his part was needed (doc. no. 62-2, p. 39).

On November 27, 2007, and November 29, 2007, Plaintiff wrote more requests to Defendant Woods complaining that he was not following his own policy and stating that he was filing his federal lawsuit "this week" (doc. no. 62-1, pp. 78, 79).

On November 25, 2007, Plaintiff filed Grievance No. 208348 complaining that Mr. Woods forced him to live with a smoker inmate, Flanigan, in violation of DOC smoking policy (doc. no. 62-1, p. 42). Defendant Fred Ruffo, Deputy Superintendent for Facility Management, responded on November 28, 2007 denying Plaintiff's grievance and noting that Plaintiff was housed in accordance with DOC policy and that he was trying to manipulate the system by using the smoking policy to get inmate Wilson assigned to his cell (doc. No. 62-1, p. 43). Plaintiff appealed this response, which was denied by Defendant Stowitzky on December 17, 2007 (doc. no. 62-1, p. 45). Plaintiff appealed this denial, which was upheld by Defendant Watson on January 10, 2008 (doc. no. 62-1, p. 47).

On November 26, 2007, Plaintiff filed Grievance No. 208090 complaining that Ms. Palladino violated his therapeutic confidentiality by making statements about his medical condition to non-medical staff (doc. no. 62-2, p. 9). Defendant Michael Mahlmeister, Deputy Superintendent for Centralized Services, responded  that his accusations would be investigated (doc. no. 62-2, p. 95). Plaintiff agreed to resolve this grievance when it was agreed that all of Palladino's responses would be destroyed (doc. no. 62-2, p. 80).

On November 29, 2007, Plaintiff filed Grievance No. 209004 complaining that Mr. Ruffo failed to properly investigate the facts of his alleged retaliation (doc. no. 62-1, p. 48). On December 24, 2007, Defendant Mahlmeister responded by denying Plaintiff's grievance and noting that Plaintiff had failed to provide evidence to support his claims of retaliation (doc. no. 62-1, p. 49).

Plaintiff appealed this response, which was upheld by Defendant Stowitzky on December 17, 2007 (doc. no. 62-1, p. 51).  Plaintiff appealed to final review, which was upheld by Defendant Watson on January 29, 2008 (doc. no. 62-1, p. 53).

On November 29, 2007, Plaintiff filed Grievance No. 209022 requesting that inmate Wilson be moved into his cell immediately (doc. no. 62-1, p. 54).  Defendant Richard Culp responded on December 14, 2007.

> . . . The Unit Manager (Mr. Wood) has the discretion to move any inmate assigned to his housing unit(s) as the need arises.  It is not for you to determine who moves into your cell and who doesn't.  Information and/or rational for Mr. Woods decision(s) doesn't need your authorization or approval.

Doc. No. 62-1, p. 55). Plaintiff appealed this response, which was denied by Defendant Stowitzky on December 31, 2007 (doc. no. 62-1, p. 57).  Plaintiff appealed this denial, which was upheld by Defendant Watson on January 30, 2008 (doc. no. 62-1, p. 59).

On January 3, 2008, Plaintiff filed an inmate request to Mr. Steinberg complaining about Ms. Palladino's no show for a scheduled group therapy session (doc. no. 62-2, p. 15).  Plaintiff wrote another request on January 19, 2008 complaining that Palladino was retaliating against the whole group by failing to schedule group sessions (doc. no. 62-2, p. 16).  Plaintiff filed Grievance No. 215557 regarding this issue on January 24, 2008 (doc. no. 62-2, p. 10).  On that same date, Plaintiff received notice that he was scheduled for aftercare programming to begin on February 26, 2008 (doc. no. 62-2, p. 11) and he agreed to resolve the grievance.

On January 14, 2008, Plaintiff wrote an inmate request to Mr. Woods complaining about excessive noise that woke him up.  On January 15, 2008, Woods responded as follows.

> I will notify the 10-6 shift commander.  As this is a continuing issue with you perhaps I should move you.  In policy section 11-2.1: I need

13

> to ensure you have a bed but where that bed is; is not negotiable but
> perhaps another cell/unit would be more accommodating to you.

Doc. No. 62-1, p. 80.  On February 3, 2008, Plaintiff wrote back to Woods telling him to move him

to the bottom bunk in J B 4-1.  Woods responded on February 4, 2008.

> You do not get to pick your cell.  If I need to move you; then it may
> be to another unit.  My request/response to you indicates nothing
> about my wishes but if you have ongoing issues with sleep, I will
> move you.

Doc. No. 62-1, p. 81.

On February 3, 2008, Plaintiff wrote an inmate request to Ms. Kelly asking where

he was on the list to receive outpatient AOD, how long to complete such programming and what

such programming consisted of (doc. no. 62-2, p. 73).  On February 5, 2008, Plaintiff was advised

to contact AOD staff regarding his concerns (doc. no. 62-2, p. 73).  On that date, he wrote a similar

request to the AOD staff and was informed that he was on the waiting list (doc. no. 62-2, p. 74).

After writing another request on February 12, 2008, Plaintiff was informed that he would be notified

in writing when there was an opening and that it took approximately six months to complete the

programming (doc. no. 62-2, p. 75).

On February 6, 2008, Plaintiff wrote Grievance No. 217254 complaining about a cell

search that occurred that day and an issue with his property storage (doc. no. 62-1, p. 60).[3]  On

February 14, 2008, Woods responded as follows.

> The search was an investigative search which was completed within
> the guidelines of a search.  Regarding your property issues, as per the

---

3   That same date, Plaintiff wrote a letter to Secretary Beard complaining of the same and
threatening that his inaction would be presented in federal court (doc. no. 62-2, p. 2).  On
February 19, 2008 Defendant Watson replied to this letter stating that the issue was being
resolved through the grievance system (doc. no. 62-2, p. 94).

> inmate handbook:  "While in general population, you are permitted
> storage space equal to four records center boxes.  This space may be
> made up of the four records center boxes or one footlocker and two
> record center boxes.  In cells that have a built-in, or free standing
> storage cabinet, you are permitted to use that space and either two
> records center boxes or one footlocker."  You are in a cell with a free
> standing cabinet therefore your limit is two records center boxes that
> are to be purchased by yourself.

Doc. No. 62-1, p. 62.  Plaintiff appealed this response to Superintendent Harlow, who upheld the

response on March 3, 2008 (doc. no. 62-1, p. 64).[4]  Plaintiff appealed this response and by letter

dated April 24, 2008, Defendant Watson upheld the response (doc. no. 62-1, p. 66).

On April 2, 2008, Woods moved Plaintiff's cellmate, inmate Flannigan, to cell J B

6-1 with a specific cellmate, Smith (doc. no. 62-2, p. 186).   On April 3, 2008, Plaintiff filed

Grievance No. 22388 complaining of Wood's alleged retaliation (doc. no. 62-1, p. 67).   On April

10, 2008, Defendant Ruffo responded that unit managers reserve the right to assign inmates to

appropriate housing/bed space (doc. no. 62-1, p. 68).   Plaintiff appealed this response to

Superintendent Harlow, who upheld the response on April 30, 2008 (doc. no. 62-1, p. 70).  Plaintiff

appealed this response and by letter dated May 12, 2008, Defendant Watson informed him that the

response to his grievance was upheld (doc. no. 62-1, p. 72).   Specifically, Defendant Watson

informed Plaintiff that he had failed to provide any proof that Woods was retaliating against him

simply because Woods did not place Plaintiff where he wanted to be housed.

On June 24, 2008, Plaintiff wrote an inmate request to Defendant Woods asking to

be placed in AOD outpatient programming "ASAP" (doc. no. 62-2, p. 76).  On June 26, 2008,

Plaintiff filed Grievance No. 233716 complaining that Defendants Harlow, Mahlmeister and Ruffo

---

4. It is also noted that a request dated February 7, 2008 for a records box was granted by
Superintendent Harlow on February 15, 2008 (doc. no. 62-2, p. 3).

failed to give him a favorable recommendation for parole and requested that these individuals be removed from his case, his case re-evaluated and $250,000.00 punitive damages from each individual (doc. no. 62-2, p. 56).  On July 7, 2008, Defendant Woods responded as follows.

> 1.  The Unit team met with you on 6-24-08 for your institutional parole review.  From there your information was forwarded up the chain of command for review and voting.  You were not given a favorable recommendation for parole as you continue to lack insight and understanding into your issues specifically regarding your sex offense. Even in your written version of your offense you deny much of your own culpability.  Therefore you continue to not take full responsibility for your crime, You continue to blame your victim for what you did.

> 2.  Additionally, you are still in need of further programming specifically AOD group.

> 3.  You provide no proof that you were not given favorable recommendation for parole based upon retaliation.  You were denied institutional support for parole on the merits of your case.

> 4.  Your grievance is denied.

Doc. No. 62-2, p. 57.  Plaintiff appealed this decision claiming that he was on the AOD group waiting list longer than three years while other inmates were placed in that group ahead of him and that other inmates have received favorable recommendations without having completed their programs (doc. no. 62-2, p. 58).  Superintendent Harlow denied his appeal on July 17, 2008 informing Plaintiff that parole decisions are based on many factors and that retaliation is not permitted (doc. no. 62-2, p. 59).  Plaintiff appealed this decision and the case was remanded by Defendant Watson on August 13, 2008 (doc. no. 62-2, p. 61).  On August 18, 2008, Lieutenant William Ayers upheld the original response to Plaintiff's Grievance No. 233716 (doc. no. 62-2, p. 62).  Plaintiff appealed this decision and Defendant Norma Varner, Acting Chief Grievance Officer upheld the response on August 29, 2008 (doc. no. 62-2, p. 64).

On September 14, 2008, Plaintiff filed Grievance No. 243307 claiming that his previous grievance concerning his parole was incorrectly decided (doc. no. 62-2, p. 66).   On September 24, 2008, Defendant Mahlmeister responded as follows.

> 1.   Inmate Alexander contends that grievance # 233716 was improperly denied by Mr. Woods, Unit Manager, as well as his appeal response by Superintendent Harlow.   He claims that institutional and DOC staff do not have the authority or discretion to deny him a favorable parole recommendation based upon the merits of his case.   Inmate Alexander is seeking the following relief:
>
> - His recommendation be reevaluated without the alleged merits of his case being considered
>
> - The alleged merits of his case be compared to the merits of every case this institution or the DOC gave a favorable support recommendation
>
> - The institution and DOC provide support and a favorable recommendation for his case
>
> 2. Inmate Alexander's personal opinions regarding the competency of our institutional staff will not address [sic] within this grievance.
>
> 3. Inmate Alexander claims that the institution and DOC are required to base their parole recommendation solely on his conduct while in prison, on his participation in and successful competition of programs.  Based upon the DC ADM 11.4.1, DOC institutional staff are not only authorized but required to determine institutional parole support.  There are more factors to be considered regarding a parole recommendation other than those stated in inmate Alexander's grievance.  As previously stated in Grievance Appeal response # 233716 by Superintendent Harlow, every parole recommendation is thoroughly investigated and many factors are considered before a decision is rendered.  This response is supported by DC ADM 11.4.1, which states that the rationale for or against a recommendation for parole will be based on a careful examination of the entire case.
>
> 4.  In regards to other cases being used as a comparison, every inmate is reviewed and recommendations are made on a case-by-case basis.  Inmate Alexander's reference to other inmates has no bearing or merit regarding his particular parole review.  The request to review

other inmates' cases with favorable support recommendations is denied.

5. Inmate Alexander's request for reevaluation is denied. His case was thoroughly reviewed and the recommendations made by the institutional staff will not be revised.

6. This grievance is denied.

Doc. No. 62-2, p. 68. Plaintiff appealed this denial and threatened that DOC staff's failure to correct the proven retaliation would be presented to federal court (doc. no. 62-2, p. 69). Lieutenant Ayers denied his appeal on October 24, 2008 (doc. no. 62-2, p. 70). Plaintiff appealed this decision and Defendant Varner upheld the response on November 19, 2008 (doc. no. 62-2, p. 72).

On October 4, 2008, Plaintiff requested and was granted permission for records storage boxes (doc. no. 62-2, pp. 4-5). On December 26, 2008, Plaintiff moved to cell J A 2-1 and inmate Washington was assigned as his cell mate. On December 30, 2008, inmate Washington was allowed to move to cell J B 1-2 with inmate Jones. Two of Plaintiff's other cell mates also were allowed to move to specific cells with specific cell mates.

On February 19, 2009, Plaintiff received the following decision regarding his parole application.

AS RECORDED ON FEBRUARY 19, 2009 THE BOARD OF PROBATION AND PAROLE RENDERED THE FOLLOWING DECISION IN YOUR CASE:

FOLLOWING AN INTERVIEW WITH YOU AND A REVIEW OF YOUR FILE, AND HAVING CONSIDERED ALL MATTERS REQUIRED PURSUANT TO THE PAROLE ACT, THE BOARD OF PROBATION AND PAROLE, IN THE EXERCISE OF ITS DISCRETION, HAS DETERMINED AT THIS TIME THAT: YOU ARE DENIED PAROLE/REPAROLE. THE REASONS FOR THE BOARD'S DECISION INCLUDE THE FOLLOWING.

- THE POSITIVE RECOMMENDATION MADE BY THE DEPARTMENT OF CORRECTIONS.

- YOUR FAILURE TO DEMONSTRATE MOTIVATION FOR SUCCESS.

YOUR MINIMIZATION/DENIAL OF THE NATURE AND CIRCUMSTANCES OF THE OFFENSE(S) COMMITTED.

YOU WILL BE REVIEWED IN OR AFTER DECEMBER 2009.

AT YOUR NEXT INTERVIEW, THE BOARD WILL REVIEW YOUR FILE AND CONSIDER:

WHETHER YOU HAVE SUCCESSFULLY COMPLETED A TREATMENT PROGRAM FOR PRESCRIPTIVE PROGRAM PLAN.

WHETHER YOU HAVE RECEIVED A FAVORABLE RECOMMENDATION FOR PAROLE FROM THE DEPARTMENT OF CORRECTIONS.

WHETHER YOU HAVE RECEIVED A CLEAR CONDUCT RECORD.

Doc. no. 62-2, P. 77.

On February 25, 2009, Plaintiff wrote to Mr. Steinberg concerning his parole denial and asking what prescriptive programs he was required to complete.  Steinberg responded on February 26, 2009 informing him that he had nothing to recommend and that he had successfully completed low intensity and SOP aftercare (doc. no. 62-2, p. 79).

On March 10, 2009, Plaintiff wrote an inmate request to Mr. Applegarth to schedule a support team meeting regarding his employment (doc. no. 62-2, p. 99).  On March 14, 2009, he wrote a similar request stating that his block runner job had been discontinued and that he was told

19

he was a janitor and he did not want a janitor job (doc. no. 62-2, p. 100).  On March 16, 2009, Apple- garth informed Plaintiff that staffing was scheduled for March 19, 2009.  During that staffing, Woods told Plaintiff that Correctional Officer Ponting had written a report indicating that Plaintiff refused to work, had done little or no work, and had an attitude.  As a result, his job was terminated.

On March 19, 2009, Plaintiff wrote Grievance No. 266481 complaining about the loss of his job (doc. no. 62-2, p. 128).  On March 31, 2009, Valerie Kisiak, Corrections Employment and Vocational Coordinator, denied his grievance noting that Ms. Ponting requested that he be removed from his job because he did poor work and had a bad attitude (doc. no. 62-2, p. 129).  Plaintiff appealed and on April 24, 209, Superintendent Harlow upheld the response denying Plaintiff's grievance (doc. no. 62-2, p. 132).  Plaintiff's final appeal was denied on May 26, 2009 by Defendant Varner (doc. no. 62-2, p. 134).

On March 19, 2009, Plaintiff filled out a pre-release application requesting that he be permitted to work outside the institution.  Defendant Woods denied this application stating "Pre release is not for working outside the institution; you just received a parole setback."  Doc. No. 62-2, p. 101.  On March 24, 2009, Plaintiff wrote an inmate request to Defendant Mahlmeister explaining that he asked Woods about his OVRT rating at the March 19, 2009 staffing and Woods refused stating that the staffing was informal and that he was only required to provide that information as part of a formal staffing, which would occur for parole or a request for pre-release, outside clearance, or computation (doc. no. 62-2, p. 111).  He further inquired whether Woods had authority to unilaterally deny his request for outside clearance (doc. no. 62-2, p. 112).  On March 30, 2009, Defendant Mahlmeister answered Plaintiff's request as follows.

20

> I have looked into your request. It is apparent that you are attempting to manipulate a staffing so that you can find out your OVRT category. That is not what staffing is for. I support Mr. Woods decision denying your request for Pre-Release. OOR is a good program but you do not meet the guidelines for it. You are not being denied your OVRT category; however there is a process that takes time. There are many other inmates here that also need to wait and be patient for their OVRT scores. I am sure when your time comes, Mr. Woods will deal with your score correctly.

Doc. No. 62-2, p. 115.

On April 2, 2009, Plaintiff wrote an inmate request to Superintendent Harlow inquiring whether Woods had authority to arbitrarily deny him pre-release without a formal staffing. Harlow responded on April 8, 2009.

> I contacted Mr. Woods regarding your eligibility for pre-release. Mr. Woods did not "arbitrarily" deny you pre-release; however, you are not being considered for OOR at this time.

Doc. No. 62-2, p. 114.

On April 1, 2009, Plaintiff wrote an inmate request to Mr. Woods asking for his OVRT category and inquiring as to his placement on the Violence Prevention Waiting list. On April 4, 2009, Woods responded as follows.

> As we have talked at your staffing and I have responded to your requests regarding being staffed for pre-release; I do not have your OVRT score. Your score should be available at your next formal staffing. Please refer to the OVRT memo. You are not presently on the list for Violence Prevention.

Doc. No. 62-2, p. 110.

On April 1, 2009, Plaintiff wrote Grievance No. 267644 again complaining about the loss of his job and threatening federal litigation (doc. no. 62-2, pp. 141-142). On April 8, 2009, Defendant Mahlmeister denied this grievance.

21

> I have reviewed your grievance and all necessary parties.  You were
> staffed for a job removal with your Unit Team at the request of your
> job supervisor.  Around that same time you requested a staffing about
> your job.  However, this was a veiled attempt by you to manipulate
> the system to receive an OVRT score.  This has already been
> responded to in a prior grievance.  You were assigned the duties of
> a Housing Unit Janitor; you chose not to do those duties.  There is
> clearly no retaliation happening to you.  Staff continues to complete
> their duties in accordance with DOC policy.

Doc. No. 62-2, p. 143.  Plaintiff appealed and on April 24, 209, Superintendent Harlow upheld the

response denying Plaintiff's grievance (doc. no. 62-2, p. 145).  Plaintiff's final appeal was denied

on May 26, 2009 by Defendant Varner (doc. no. 62-2, p. 147).

On April 1, 2009, Plaintiff received a misconduct alleging Class 1, Cat. B # 40 -

unauthorized use of the mail or telephone and Class 1, Cat. B # 42 lying to an employee (doc. no.

62-2, p. 189).  This misconduct stemmed from a search of Plaintiff's cell that yielded a letter from

Plaintiff to his brother asking him to write to Superintendent Harlow about his mistreatment.  After

the search, Plaintiff was questioned about the letter and at first denied it but later admitted to it.  At

the misconduct hearing, the hearing examiner dismissed charge # 40 but found a preponderance of

the evidence, based on Correctional Officer McFadden's report, to support the charge of lying to an

employee and Plaintiff was sanctioned with seven days of cell restriction (doc. no. 62-2, p. 190).

Plaintiff appealed on the basis that the punishment was disproportionate to the offense and requested

that the misconduct be reduced from Class I to Class II (doc. no. 62-2, p. 192).  This appeal was

denied by the Program Review Committee consisting of Defendant Ruffo, Unit Manager Michele

Wagner, and CCPM Paul Theriault (doc. no. 62-2, p. 193).  Plaintiff appealed to Superintendent

Harlow who denied the appeal on May 7, 2009 (doc. no. 62-2, p. 195).  Plaintiff file an appeal to

final review, which was denied by Timothy Mark, Deputy Chief Counsel for Hearing and Appeals in the Office of Chief Counsel (doc. no. 62-2, p. 62-2, p. 197).

On April 21, 2009, Plaintiff wrote an inmate request to Mr. Harlow asking when he would be staffed for outside clearance (doc. no. 62-2, p. 113).  On May 3, 2009, Plaintiff wrote Grievance No. 270840 complaining that Woods, Mahlmeister and Harlow were denying him a formal staffing and access to his OVRT category (doc. no. 62-2, p. 116).   On May 7, 2009, Defendant Ruffo denied his grievance informing Plaintiff that formal staffing is held in accordance with DOC policy and not based solely on an inmate request (doc. no. 62-2, p. 117).  Plaintiff appealed claiming that he was being denied mandatory programming (doc. no. 62-2, p. 118).  On June 1, 2009, CCPM Paul Theriault upheld the denial of Plaintiff's grievance stating that Plaintiff's programming was being conducted in accordance with DOC policy (doc. no. 62-2, p. 119).  Plaintiff appealed claiming that all DOC staff were hereby on notice that their failure to correct the retaliation would be presented in federal court (doc. no. 62-2, p. 120).  On June 23, 2009, Defendant Varner upheld the denial of Plaintiff's grievance on final review (doc. no. 62-2, p. 121).

On May 9, 2009, Plaintiff wrote Grievance No. 272544 complaining that his application for Pre-Release was denied (doc. no. 62-2, p. 122).  On May 14, 2009, Defendant Ruffo denied his grievance informing Plaintiff that his application for pre-release was reviewed and processed in accordance with DOC policy DC-ADM 801 and that satisfying all edibility criteria does not automatically qualify an inmate for program participation (doc. no. 62-2, p. 123).  Plaintiff appealed claiming that Woods, Mahlmeister and Harlow refused to consider him for pre-release based on retaliation for his civil lawsuit(doc. no. 62-2, p. 1245).  On June 1, 2009, CCPM Paul Theriault upheld the denial of Plaintiff's grievance (doc. no. 62-2, p. 125).  Plaintiff appealed

claiming that all DOC staff are hereby on notice that their failure to correct the retaliation would be presented in federal court (doc. no. 62-2, p. 126).  On June 23, 2009, Defendant Varner upheld the denial of Plaintiff's grievance on final review (doc. no. 62-2, p. 127).

### C. Exhaustion of Administrative Remedies

This Court may review only those claims that have been fully exhausted as required by the Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996).  In this regard, in the PLRA, Congress amended the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. § 1997e, concerning suits by prisoners.  Before the amendments, prisoners challenging the conditions of their confinement under 42 U.S.C. § 1983 were not required to exhaust administrative remedies before filing suit.  The PLRA amended section 1997e(a), as follows, making exhaustion a mandatory requirement.

> (a)     Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a), as amended.

The United States Court of Appeals for the Third Circuit analyzed the applicability of the exhaustion requirement in 42 U.S.C. § 1997e in Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000) (Bivens action brought by a federal inmate) and Booth v. Churner, 206 F.3d 289 (3d Cir. 2000) (civil rights action brought by a state prisoner).  In each of these cases, the Court of Appeals announced a bright line rule that inmate-plaintiffs must exhaust all available administrative remedies before they can file an action in federal court concerning prison conditions.  In so holding, the court

specifically rejected the notion that there is ever a futility exception to section 1997e(a)'s mandatory exhaustion requirement.  Booth, 206 F.3d at 300; Nyhuis, 204 F.3d at 66.  A unanimous Supreme Court affirmed the Court of Appeals' holding in Booth v. Churner, 532 U.S. 731 (2001) where the Court confirmed that in the PLRA Congress mandated complete exhaustion of administrative remedies, regardless of the relief offered through those administrative procedures.  In addition, in Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court clarified that the PLRA's exhaustion requirement applies to all inmate suits concerning prison life, whether they involve general circumstances or specific episodes and whether they allege excessive force or other conduct.

The administrative grievance procedure for Pennsylvania inmates is codified in the Pennsylvania Department of Corrections Policy Statement No. DC-ADM 804-1, entitled "Consolidated Inmate Grievance Review System."  The purpose of the grievance system is to insure that every inmate confined in a Bureau of Correction facility has an avenue through which prompt resolution of any problem which arises during the course of confinement may be sought.  DC-ADM 804 ¶ 1.  The grievance system applies to all state correctional institutions and provides three levels of review:  1) initial review by the facility grievance coordinator; 2) appeal of initial review to the superintendent or regional director; and 3) final appeal to the Secretary's Office.  DC-ADM 804 ¶ VI. The administrative policy further provides that, prior to utilizing the grievance system, prisoners are required to attempt to resolve problems on an informal basis through direct contact or by sending an inmate request slip to the appropriate staff member.  DC-ADM 804 ¶ V.

A prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after filing a complaint in federal court.  Ahmed v. Dragovich  297 F.3d 201, 209 (3d Cir. 2002).  Moreover, a Pennsylvania prisoner may procedurally default his claims

by failing to comply with the procedural and substantive requirements of DOC's grievance policy, as set forth in DC ADM 804, thereby precluding an action in federal court. *See* <u>Spruill v. Gillis</u>, 372 F.3d 218 (3d Cir. 2004).[5]  The United States Supreme Court adopted a similar holding in <u>Woodford v. Ngo</u>, 548 U.S.81 (2006) wherein it held that an untimely or otherwise procedurally defective administrative grievance or appeal does not satisfy the PLRA's mandatory exhaustion requirement.

  In the instant action, it appears that Plaintiff has exhausted all of the claims he raised in his Amended Complaint.  Moreover, Defendants did not oppose Plaintiff's Motion to file a Supplemental Complaint alleging new claims against Defendant Woods recognizing that it would likely serve the interests of judicial economy if the Plaintiff's motion were granted and that it would avoid the necessity of duplicative filings and/or a separate action.  Doc. No. 37.  Thus, to the extent Plaintiff filed grievances to final review concerning such claims, they will be addressed below.

### D. Liability under 42 U.S.C. § 1983

  Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege:  1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  <u>West v. Atkins</u>, 487 U.S. 42 (1988); <u>Parratt v. Taylor</u>, 451

---

5.  In so holding, the Court held that failing to specifically name accused individuals in a grievance amounted to procedural default because the regulations so required. The relevant regulations provide as follows:  "The inmate shall include a statement of the facts relevant to the claim.  The inmate should identify any persons who may have information that could be helpful in resolving the grievance.  The inmate should also include information on attempts to resolve the matter informally.  DC-ADM 804, Part VI.A.1.d.

U.S. 527, 535 (1981), *overruled in part on other grounds*, <u>Daniels v. Williams</u>, 474 U.S. 327, 330-331 (1986).

To establish personal liability against a defendant in a section 1983 action, that defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976). Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. <u>Rode</u>, 845 F.2d at 1207.

Plaintiff seeks to hold liable many of the Defendants based solely upon their involvement in reviewing and/or rejecting his many grievances and letters. A similar claim was thoroughly rejected in Plaintiff's previous lawsuit.

> The plaintiff's complaint should be dismissed with respect to defendants Beard, James, Burks, Kyler, Bitner, Henry, and the unidentified defendants because of their lack of personal involvement. For each of these defendants, the plaintiff has presented no evidence beyond his merest allegations, which are cursory and conclusory, that they were involved in the events underlying his claim. There is no evidence suggesting that any of these defendants did anything except what was required by and appropriate for their jobs in responding to his complaints and grievances, to the results of which the plaintiff took exception.

> The plaintiff does not allege that defendants Beard personally directed the retaliatory actions against him. Rather, he alleges that defendant Beard knew of and acquiesced in the retaliation because he took no action to stop the retaliation subsequent to the plaintiff's informing defendant Beard of the conduct. The evidence suggests that the plaintiff forwarded his complaints and grievances to defendant Beard, but there is no evidence beyond the plaintiff's

conclusory allegations that defendant Beard knew of and acquiesced in the plaintiff's alleged harassment.  Even assuming that defendant Beard knew in fact of the plaintiff's allegations, it is not acquiescence on his part to allow his subordinates to do their duty with respect to investigating those allegations and to accept his subordinates' conclusions that the plaintiff's allegations lacked merit.

Likewise, defendants James, Burks, Kyler, and Bitner, whom the plaintiff alleges are liable for knowing of and acquiescing in the plaintiff's alleged harassment merely because they denied the plaintiff's grievance and misconduct appeals.  It is not acquiescence for them to do their jobs; nor are they liable because the plaintiff was dissatisfied with their conclusions. Moreover, there is no substantial allegation against defendants James, Burks, Kyler, and Bitner to establish that they did anything more or less than required by their duty-the plaintiff's claims are insufficiently cursory and conclusory. Mere knowledge of the plaintiff's complaints and a finding adverse to the plaintiff do not indicate acquiescence. There is no evidence, but simply bald allegations, that any of these defendants exceeded their authority or acted improperly in exercising that authority.

<u>Alexander v. Forr</u>, Civil No. 2006 WL 2796412, 19 -20  (M. D. Pa. Sept. 27, 2006).[6]

Similarly, Plaintiff can not impose liability against any of the Defendants based solely on his or her involvement with his correspondence, grievances and misconducts as such conduct is insufficient to establish personal involvement as required under 42 U.S.C. § 1983.  Moreover, for the reasons set forth below, Plaintiff has thus failed to show that there is any genuine issue of material fact with respect to any of his claims.  Consequently, all of the Defendants are entitled to summary judgment and an appropriate order will follow.

### E. First Amendment  - Retaliation

---

6. *See also* <u>Bullock v. Horn</u>, Civil No. 99-1402, 2000 WL 1839171, *5 ((M. D. Pa., Oct. 31, 2000) ("Merely asserting that Plaintiff sent letters to these two defendants will not suffice. Indeed, it would be anomalous to suggest that a prisoner could name as a Defendant any governmental official whatsoever, no matter how far removed in the chain of authority from the actual conduct in question, simply by sending that official a letter.").

All of Plaintiff's claim allege that Defendants' actions were the result of retaliation for his filing grievances and lawsuits.  Specifically, Plaintiff alleges the following in the Amended Complaint: 1)  Fritch and Brocklehurst denied Plaintiff appropriate housing; 2) , Kite, Viscusi, and Woods denied Plaintiff the non-smoking compatible cellmate he requested; 3) Burks, Pavlick, Stowitzky, Culp, Pleacher, Watson, Beard, Ruffo, Harlow, and Mahlmeister failed/refused to give Plaintiff's grievances, grievance appeals, and/or complaints a fair hearing or investigation; 4) Palladino failed/refused to provide programming services for Plaintiff; and 4) Ruffo, Harlow, Mahlmeister, and Woods failed to provide institutional support for a favorable parole recommendation.  In the Supplemental Complaint, Plaintiff alleges that Woods had Plaintiff fired from inmate employment, was involved in a false misconduct charge, prevented Plaintiff from being considered for outside work clearance, denied Plaintiff access to mandatory program services and confiscated Plaintiff's typewriter.

It is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under section 1983.  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things:  (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997).

With respect to the first factor, it is well settled that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right. Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  Accordingly, a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied. Rauser, 241 F.3d at 333.  Rather, the first requirement a Plaintiff must show is that the conduct which led to the alleged retaliation was constitutionally protected.  *Id.*

A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim.  *See* Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution); Woods, 60 F.3d at 1165 (prison officials may not retaliate against an inmate for complaining about a guard's misconduct).  Plaintiff claims that the retaliation was the result of his filing grievances and complaints.  Thus, he has alleged the first element of a retaliation claim.

The second element requires a prisoner to show that he suffered some "adverse action" at the hands of the prison officials.  A plaintiff can satisfy the second requirement by demonstrating that the "adverse" action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  *See* Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). Adverse actions that are sufficient to support a retaliation claim include filing false misconduct reports, Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), transferring a prisoner to another prison, Rauser, 241 F.3d at 333, and placing a prisoner in administrative custody, Allah, 229 F.3d at 225.

The third factor requires that there be a causal link between the exercise of the constitutional right and the adverse action taken against the prisoner.  Rauser, 241 F.3d at 333-34. This may be established by evidence of a temporal proximity between the prisoner's protected activity and the defendant's adverse action; however, the timing of the alleged retaliatory action must be suggestive of retaliatory motive.  *See* Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007) (to show a causal connection, a plaintiff must prove "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link"); Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003) (holding that the temporal proximity between the protected conduct and the alleged retaliatory action must be "unusually suggestive" before the court will infer a causal link) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).

If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors.  Mt. Healthy, 429 U.S. at 287.  "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334.  In establishing the elements of a retaliation claim, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (internal citations omitted).  Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient

skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner.  *See* Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  Finally, allegations of *de minimis* acts of retaliation do not state a claim under § 1983.  Thaddeus-X v. Blatter, 175 F.3d 378, 397 (6th Cir. 1999); Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001) (holding that a *de minimis* retaliatory act is outside the ambit of constitutional protection).  Using these precepts, the Court will review Plaintiff's claims.

1.    Improper handling of grievances and complaints

Plaintiff alleges that Defendants denied his grievances and failed to properly investigate his grievances and complaints.  Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.  This objective inquiry is not static across contexts; it must be tailored to the different circumstances in which retaliation claims arise.  Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) ("Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.").

As recognized in Plaintiff's previous case, it is not at all clear that the rejection or denial of a grievance, or any similar action, constitutes an "adverse action" as required to state a retaliation claim.

> It is doubtful that rejection or denial of a grievance constitutes the kind of adverse action that would deter a person of ordinary firmness from exercising constitutional rights. In this regard, the grievance process contains multiple levels of review, allowing an inmate to redress mistaken rejections or denials. Thus, the mere fact that a grievance has been rejected or denied would not seem to be

> that kind of conduct that would deter an inmate or ordinary firmness
> from pursuing the grievance process.  Certainly, Alexander has not
> been deterred from utilizing the grievance processes established by
> the Department of Corrections.

Alexander, 2006 WL 2796412 * 3, fn. 4.  Furthermore, as noted by Defendants, proper exhaustion

is required in order to bring a federal civil rights action. Therefore, it seems unlikely that the mere

denial of a grievance or denial of a grievance appeal would serve to deter a person of ordinary

firmness from filing grievances and/or lawsuits in the future.

In addition, Plaintiff has not produced any evidence that any action Defendants took

in regards to Plaintiff's grievances, grievance appeals, and/or complaints was motivated by

retaliatory animus.

> Contrary to Alexander's assertion, the mere fact that his
> grievances were rejected or denied does not suffice to warrant an
> inference that the rejection or denial was retaliatory. If that were the
> case, then there would exist a First Amendment retaliation claim any
> time an inmate was dissatisfied with the outcome of the grievance
> proceedings or a Department of Corrections' official mistakenly
> handled an administrative grievance.  The law requires the existence
> of a causal link between the exercise of a protected right and adverse
> action taken by a prison official " 'sufficient to deter a person of
> ordinary firmness from exercising his rights.' " Rauser v. Horn, 241
> F.3d at 333 (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir.
> 2000)). Rejection or denial of a grievance, even on erroneous
> grounds, does not perforce suggest a retaliatory motive.

Alexander, 2006 WL 2796412, at *3.

Thus, Plaintiff has failed to meet his burden of showing either the second or third

factor as to his retaliation claim regarding the alleged improper handling of his grievances and

complaints.  Consequently, Defendants are entitled to summary judgment as to this claim.

2.    Improper housing

33

Plaintiff next claims that Defendants Fritch, Brocklehurst, Kite, Viscusi, and Woods denied Plaintiff appropriate housing.  Again, Plaintiff has failed to meet his burden of showing either the second or third factor as to this retaliation claim.  Specifically, the adverse action of moving Plaintiff to a non-smoking housing unit in general population cannot be considered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  When Plaintiff complained about his housing unit which had a smoking room, he was told that he would be moved to a non-smoking housing unit as soon as one opened up.  In January of 2006, Plaintiff was moved to D Unit, a nonsmoking housing unit pursuant to his request.  The fact that inmates continued to sneak cigarettes in that unit does not result in a conclusion that the transfer was retaliatory.  Instead, Defendants' actions in transferring Plaintiff to a nonsmoking housing unit were related to a legitimate penological concern.

The same is true as to Plaintiff's requests to be celled with a specific inmate, including inmate Wilson.  Failing to allow Plaintiff to cell with the inmates of his choice cannot be considered "adverse actions" sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  Moreover, Plaintiff has not produced any evidence aside from his bald unsupported statements to show that his propensity for filing grievances was the substantial motivating factor behind Plaintiff's housing assignments.  In this regard, the record shows that SCI-Mercer did not utilize "cell agreements."  In addition, staff did not move an inmate out of a cell in order to accommodate another inmate's request to move in a specific cellmate (doc. no. 55-2, pp. 22, 29).

Plaintiff claims that he and three other inmates submitted paperwork to Defendant Fritch asking to be housed in the same cube.  This request could not be accommodated because the

inmates with whom Alexander was cubed at the time did not want to move (doc. no. 55-2, p. 22). When inmate Wilson returned to J Unit, and expressed a desire to return to Plaintiff's cell, Plaintiff already had a new cellmate (doc. no. 55-2, p. 28). Thus, it was determined that Wilson could not be moved to Alexander's cell. Realizing this, Alexander then sought to manipulate the system by filing a grievance complaining that his current cellmate was a smoker (doc. no. 62-1, p. 42). Defendant Ruffo denied this grievance noting that Plaintiff was housed in accordance with DOC policy and that he was trying to manipulate the system by using the smoking policy to get inmate Wilson assigned to his cell (doc. No. 62-1, p. 43). Again, the record evidence shows that Plaintiff's housing assignments were based on legitimate penological concerns. Thus, Plaintiff has failed to establish the essential third element with respect to his housing claims, *i.e.*, that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. Consequently, Defendants are entitled to summary judgment as to Plaintiff's retaliation claims concerning his cell assignments.

       3.    <u>Palladino's alleged failure to provide programming services</u>

Plaintiff's next retaliation claim is that Defendant Palladino failed/refused to schedule and provide mandatory prescriptive programming thus rendering him ineligible for parole in retaliation for Plaintiff's prior grievance against her. In this regard, prior to her retirement in April of 2008, Barbara Palladino was a Psychological Services Specialist at SCI-Mercer (doc. no. 55-2, p. 6). As a Psychological Services Specialist, Palladino facilitated a variety of programs at the institution, including the various sex offender treatment programs, several of which Plaintiff was required to participate in. Palladino was not responsible for scheduling programming; rather, she facilitated those programs after the inmates were enrolled.

Plaintiff  was enrolled in a low-risk sexual offender treatment program which was facilitated by Palladino.  Plaintiff completed this program on March 27, 2008 (doc. no. 62-2, p. 98). On January 3, 2008, Plaintiff filed an inmate request to Mr. Steinberg complaining about Ms. Palladino's "no show" for a scheduled group therapy session (doc. no. 62-2, p. 15).  Plaintiff wrote another request on January 19, 2008 complaining that Palladino was retaliating against the whole group by failing to schedule group sessions for Sex Offender Program Aftercare (doc. no. 62-2, p. 16).  Plaintiff filed Grievance No. 215557 regarding this issue on January 24, 2008 (doc. no. 62-2, p. 10).  On that same date, Plaintiff received notice that he was scheduled for aftercare programming to begin on February 26, 2008 (doc. no. 62-2, p. 11) and he agreed to resolve the grievance.

With respect to this claim, Plaintiff claims that Defendant Palladino retaliated against him <u>due to his prior grievance against her</u>.  Amended Complaint, ¶ 8 (emphasis added).  A review of Plaintiff's grievances, however, does not show any other grievance filed by Plaintiff against Defendant Palladino (doc. no. 52-2, pp. 36-38).  Thus, Plaintiff has failed to make even the first showing of a retaliation claim.  Nor does Plaintiff provide any evidence that Palladino's alleged "no show" resulted in any adverse action as he was scheduled for aftercare on January 24, 2008 (doc. no. 62-2, p. 184) and completed aftercare programming on November 20, 2008 (doc. no. 62-2, p. 88).  Thus, he has failed to establish any retaliation by Defendant Palladino and she is entitled to summary judgment.

4.    <u>Failure to provide parole recommendation</u>

Plaintiff next claims that Defendants Ruffo, Harlow, Mahlmeister, and Woods failed to provide him with a favorable recommendation for parole.  This issue was thoroughly addressed, twice, in Grievance Nos. 233716 and 243307, discussed above.  As indicated in the responses to

those grievances, DOC staff reviewed Plaintiff's parole application in accordance with all of the criteria identified in DC ADM 11.4.1. Moreover, parole recommendations are made on a case-by-case basis utilizing many factors. In Plaintiff's case, Defendants did not support his parol application because, in their opinion, Plaintiff lacked insight and understanding into his issues regarding his sex offense. Specifically, it was noted that "[e]ven in your written version of your offense you deny much of your own culpability. Therefore you continue to not take full responsibility for your crime, You continue to blame your victim for what you did." Doc. No. 62-2, p. 57.[7] Defendants believed that Plaintiff was not a good candidate for parole because he did not take full responsibility for his crime of crossing state lines from Pennsylvania to Kentucky to pick up an under-aged teenage girl he met on the internet and drive her back to Pennsylvania where he had sexual relations with her. Petitioner makes much of the fact that the girl had a fake identification that showed she was eighteen years old. Defendants believed that his reliance on this fact tended to show that he did not accept full responsibility for his crimes. While Plaintiff may not agree with Defendants' interpretation of his written version of his crime, it is not for this Court to second guess DOC's expertise in making the difficult determination concerning an inmate's ability to successfully re-enter society prior to the expiration of a lawful sentence. The record reveals that Defendants had a legitimate penological rationale for denying Plaintiff a favorable recommendation for parole. Consequently, they are entitled to summary judgement as to his parole recommendation claim.

---

7. This Court notes that Defendants' rationale for denying Plaintiff's parole application is in accordance with the widespread recognition of "the high rate of recidivism among convicted sex offenders and their dangerousness as a class," *See* Smith v. Doe, 538 U.S. 84, 103 (2003) ("[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault,") (internal quotation marks omitted).

5.      Removal from employment

In the Supplemental Complaint, Plaintiff alleges that Defendant Woods had him fired from his employment without just cause.  This claim was the subject of Grievance No. 266481.  As stated above, sometime in early 2009, Plaintiff's block runner job was discontinued and he was given a job as a janitor.  As he did not wish to be a janitor, he requested a staffing to discuss his employment.  Apparently, a staffing also was initiated because Correctional Officer Ponting had written a report stating Plaintiff refused to work, had done little or no work and had an attitude.  As a result, his job was terminated.  During the job staffing on March 19, 2009, Plaintiff was made aware of Ponting's report and notified that his job had been terminated.  Again, the record shows that Defendants had a legitimate penological reasons for removing Plaintiff from his employment, *i.e.*, their belief that he performed poorly and had a bad work attitude (doc. no. 62-2, p. 129).  Thus, Plaintiff can not show a retaliation claim as to the loss of his job.

6.      Misconduct report

Next in the Supplemental Complaint, Plaintiff alleges that Defendant Woods was involved in filing a false misconduct charge against him.  The filing of a prison disciplinary report is not actionable under 42 U.S.C. § 1983 as prohibited "retaliation" unless the report is, in fact, false.  In other words, the finding of guilt of the underlying misconduct charge satisfies a defendant's burden of showing that he would have brought the misconduct charge even if plaintiff had not filed a grievance.  *See* Harris-Debardelaben v. Johnson, 121 F.3d 708, 1997 WL 434357, at *1 (6th Cir. July 31, 1997); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir.), *cert. denied*, 119 S.Ct. 246 (1998); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) (a finding of guilty of a prison rule violation based on some evidence "essentially checkmates [the] retaliation claim."), *cert. denied*, 115 S.Ct.

2584 (1995).  *See also* <u>Carter v. McGrady</u>, 292 F.3d 152 (3d Cir. 2002) (noting that even if prison officials were motivated by animus to jailhouse lawyers, there was sufficient evidence of the plaintiff's misconduct offenses to conclude that the misconducts would have issued notwithstanding his jailhouse lawyering); <u>Allah v. Al-Hafeez</u>, 208 F. Supp. 2d 520 (E.D. Pa. 2002).

Here, Plaintiff received a misconduct charging him with unauthorized use of the mail or telephone and lying to an employee (doc. no. 62-2, p. 189).  This misconduct stemmed from a search of Plaintiff's cell that yielded a letter from Plaintiff to his brother asking him to write to Superintendent Harlow about his mistreatment.  At the misconduct hearing, the hearing examiner dismissed the first charge but found a preponderance of the evidence, based on Correctional Officer McFadden's report, to support the charge of lying to an employee and Plaintiff was sanctioned with seven days of cell restriction (doc. no. 62-2, p. 190).  This constitutes "some evidence" sufficient to support a prison disciplinary conviction.  *See* <u>Superintendent v. Hill</u>, 472 U.S. 445, 455-56 (1985).  Consequently, Defendants are entitled to summary  judgment as to Plaintiff's retaliation claim alleging filing a false misconduct charge.

7.     <u>Confiscation of typewriter</u>

Plaintiff further alleges that Defendant Woods was involved in confiscating his typewriter.  Plaintiff's typewriter was temporarily confiscated as a result of his misconduct and was returned to him approximately two weeks later (doc. no. 55-2, p. 13).  Such activity is not an adverse action sufficient to support a retaliation claim.

8.     <u>Outside work clearance</u>

Plaintiff claims that Woods prevented him from being considered for outside work clearance.  Outside work clearance consists of physical labor performed on the prison grounds but

outside the fence.  The record shows that Plaintiff was not considered for outside work clearance because:  1) he was not doing the job to which he was assigned; and 2) he was restricted to light-duty jobs (doc. no. 55-2, p. 12).  Therefore, there was no work that Plaintiff could perform on outside work clearance.  It follows that Plaintiff can not establish a retaliation claim regarding the denial of his application for outside work clearance.

9.    Mandatory programming

Finally, Plaintiff alleges that Woods denied him access to mandatory programs.  In this regard, Plaintiff seems to be complaining about his placement on the waiting list for violence prevention programming. The record contains a memorandum entitled "Notice to Inmates" regarding "Violence Prevention Group Changes" (doc. no. 62-2, pp. 96-97).  This document provides that the DOC changed the Violence Prevention Program, which was affected by the recently announced Offender Violence Risk Topology (OVRT).  Specifically, an inmate's OVRT score would be used to recommend the appropriate violence prevention programming:  low intensity  - 12 sessions; moderate intensity - 26 sessions; or high intensity - 50 sessions.  This document, which refers to an OVRT memo distributed March 6, 2009, notifies inmates that they will receive their OVRT rating at their next formal staffing for parole, pre-release, outside clearance or commutation.  The OVRT divides inmates into three categories and specifies particular institutional and parole eligibility requirements applicable to each category.

Plaintiff wrote Grievance No. 270840 complaining that Woods, Mahlmeister and Harlow were denying him a formal staffing and access to his OVRT category (doc. no. 62-2, p. 116).  On May 7, 2009, Defendant Ruffo denied his grievance informing Plaintiff that formal staffing is

held in accordance with DOC policy and not based solely on an inmate request (doc. no. 62-2, p. 117).  It was further noted that Plaintiff was tying to manipulate the system to get his OVRT score by seeking a formal staffing via his application for outside work clearance.

This case makes it abundantly clear that not every allegedly adverse action is sufficient to support a claim of retaliation.  *See, e.g.*, Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (holding that a retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, literally, "after this, therefore because of this.").  Here, just as in his previous case:

> In sum, the plaintiff has pointed to no evidence showing directly or inferentially that the defendants retaliated against him.  He has failed to show that a retaliatory animus was a substantial or motivating factor in any of the defendants' adverse actions. Instead, the defendants' actions were the legitimate consequences of the difficult task of prison administration. On the basis of the record before the court, the plaintiff has failed to meet his burden, and the court will not shift the burden to the defendants.  The plaintiff has not shown that there is any genuine issue of material fact concerning his retaliation claim.  Consequently, the moving defendants' motion for summary judgment should be granted.

Alexander, 2006 WL 2796412, at * 23.

An appropriate order follows.

Dated: March 26, 2010

LISA PUPO LENIHAN
U.S. Magistrate Judge

cc:     Raymond Alexander
        ET - 1459
        SRCF Mercer
        801 Butler Pike
        Mercer, PA  16137

        Counsel of record.